EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ángel J. Suárez Sierra<br>Mildred L. Santana Mejías<br><br>Recurridos<br><br>v.<br><br>Levitt Homes, Inc. y otros<br><br>Peticionaria | Certiorari<br><br>2006 TSPR 57<br><br>167 DPR _____ |

Número del Caso: CC-2004-701

Fecha: 11 de abril de 2006

Tribunal de Apelaciones:

Región Judicial de Bayamón

Panel integrado por su presidente, el Juez Arbona Lago, el Juez Urgell Cuebas y la Jueza Feliciano Acevedo

Abogados de la Parte Peticionaria:

Lcdo. Mario J. Pabón-Cátala
Lcda. Nynorsha C. Lugo-Sánchez

Abogada de la Parte Recurrida:

Lcda. Mildred L. Santana Mejías

Asociación de Constructores de Hogares de Puerto Rico:

Lcdo. Roberto Lefranc Morales
Lcda. Hilda Quiñones Rivera

Materia: Vicios de Construcción, Daños y Perjuicios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel J. Suárez Sierra
Mildred L. Santana Mejías

    Recurridos

       v.                           CC-2004-701  Certiorari

Levitt Homes, Inc. y otros

    Peticionaria

SENTENCIA

San Juan, Puerto Rico a 11 de abril de 2006.

Levitt Homes, Inc. (en adelante Levitt) acude ante nos solicitando la revocación de un dictamen emitido por el Tribunal de Apelaciones. Mediante dicha decisión se determinó que en el presente caso no comenzó a transcurrir el plazo decenal para reclamarle a Levitt responsabilidad por vicios de construcción hasta el momento en que se otorgó la escritura pública de compraventa suscrita entre éste y los esposos Ángel Suárez Sierra y Mildred L. Santana Mejías (en adelante "compradores"). En esencia, Levitt sostiene que, contrario a lo resuelto por el foro

apelativo, el plazo decenal se activó en el momento en que la Administración de Permisos y Reglamentos (en adelante ARPE) concedió el permiso de uso de la residencia.

Examinados los alegatos sometidos, confirmamos el dictamen emitido por el Tribunal de Apelaciones.

## I.

El 31 de diciembre de 1992, los compradores adquirieron la unidad CE-41 de la Urbanización Camino del Mar en Toa Baja mediante escritura de compraventa. La referida urbanización fue desarrollada y financiada por Levitt.

Al momento de otorgarse la escritura de compraventa, Levitt no había terminado de corregir ciertos defectos de construcción que los compradores le habían señalado luego de realizar una inspección ocular de la residencia. No obstante, los compradores accedieron a finalizar la compraventa antes de que se corrigieran dichos defectos ya que Levitt tenía la urgencia de completar el negocio antes de finalizar el año 1992. Levitt corrigió la mayor parte de estos defectos en enero de 1993.

Más de cinco años después, los compradores le cursaron una misiva a Levitt comunicándole que habían surgido nuevos vicios de construcción en su residencia. Levitt no hizo nada respecto a esta reclamación.

Así las cosas, el 30 de diciembre de 2002 los compradores demandaron a Levitt ante el Tribunal de

Primera Instancia por defectos en la construcción al amparo de lo preceptuado en el Artículo 1483 del Código Civil, 31 L.P.R.A. sec. 4124. Reclamaron la corrección de los referidos vicios de construcción y la concesión de sobre cuarenta mil dólares ($40,000) en daños y perjuicios.

Levitt presentó ante el foro de instancia una moción de sentencia sumaria mediante la cual solicitó la desestimación de la demanda presentada en su contra. Alegó, en síntesis, que la causa de acción de los compradores fue presentada luego de haber transcurrido los diez (10) años que dispone el Artículo 1483 para ello. Sostuvo que el referido plazo decenal comenzó a transcurrir el 17 de diciembre de 1992, fecha en que la Administración de Reglamentos y Permisos (en adelante ARPE) expidió el permiso de uso de la unidad en controversia.

El Tribunal de Primera Instancia concluyó que el plazo decenal se activó con el otorgamiento de la escritura de compraventa el 31 de diciembre de 1992, ya que es en ese momento cuando se acepta definitivamente la obra. Por ende, denegó la solicitud de sentencia sumaria presentada por Levitt.

Inconforme con dicha determinación, Levitt acudió ante el Tribunal de Apelaciones. El foro apelativo se negó a expedir el auto solicitado pues consideró que el Tribunal de Primera Instancia actuó correctamente al

rehusarse a desestimar sumariamente la demanda presentada por los compradores.

Todavía insatisfecho, Levitt acude ante nos mediante petición de *certiorari* solicitando la revocación de la resolución emitida por el Tribunal de Apelaciones en el caso de autos. En esencia, reproduce los mismos planteamientos que esbozó ante el foro de instancia. Expedimos el auto solicitado. Ambas partes han comparecido. Además, la Asociación de Constructores de Hogares de Puerto Rico compareció ante nos como *amicus curiae*. Estando en posición de resolver, procedemos a así hacerlo.

## II.

El Artículo 1483 del Código Civil establece, en lo pertinente, que:

> El contratista de un edifico que se arruinase por vicios de construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez (10 años), contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirige, si se debe la ruina a vicios del suelo o de la dirección. 31 L.P.R.A. 4124.

La protección otorgada al comprador mediante dicho artículo solamente se activa cuando éste demuestra que los vicios de construcción son de tal magnitud que ocasionan la ruina del edificio o unidad. Pacheco Torres v. Estancias de Yauco, res. el 30 de septiembre de 2003, 2003 T.S.P.R. 148; Rivera v. A & C Development Corp., 144 D.P.R. 450 (1997). Una vez el comprador evidencia que

su propiedad está arruinada se activa una presunción de culpa en contra del contratista a cargo de la construcción. Desde ese momento, le corresponde al contratista presentar prueba que demuestre una de dos circunstancias, a saber: (1) que el edificio o la unidad no está arruinado, o (2) que la ruina no se debió a su negligencia. *Id.*

El plazo decenal durante el cual se debe presentar una reclamación por vicios de construcción es tanto de garantía como de caducidad. Por ende, los defectos en la propiedad deben de surgir dentro del transcurso del referido término. Además, la acción reclamando indemnización por los daños causados por los vicios debe ser presentada antes de que expire el plazo decenal. Rivera v. Las Vegas De. Co., Inc., *id.*

Con relación a cuando comienza a decursar el referido plazo, en el pasado hemos expresado que éste se activa con la recepción definitiva de la obra por el dueño. Es precisamente en este momento cuando el dueño renuncia a reclamar por los vicios aparentes de la obra mas no por los vicios ocultos ni los que puedan arruinar la propiedad. Pacheco Torres v. Estancias de Yauco, *supra*.

De otra parte, resulta pertinente señalar que "de ordinario, los términos que nuestro ordenamiento reconoce para reclamar por defectos o vicios de construcción se computan a partir del otorgamiento de la escritura de

compraventa." <u>Asociación de Residentes Pórticos de Guaynabo v. Compad, S.E.,</u> res. el 16 de diciembre de 2004, 2004 T.S.P.R. 203.

Por otro lado, en <u>Asociación de Residentes Pórticos de Guaynabo</u>, *Id*, nos rehusamos a reconocer que el plazo para reclamar daños por defectos en las áreas comunales de un condominio comienza a decursar en el momento en que ARPE concede los permisos de uso de la vivienda. Fundamentamos dicha conclusión en que, de utilizar dicha fecha como punto de partida para computar el referido plazo, "estaríamos acortando irrazonablemente el período que tiene todo titular en un condominio para hacer sus reclamaciones por vicios de construcción." *Id.* Sostuvimos, además, que acoger la teoría de la peticionaria en aquel caso "equivaldría a establecer que el momento en que comienza a decursar el término para incoar la reclamación es anterior a la fecha en la que el titular adquiere el apartamento." *Id.*

A pesar de que los anteriores pronunciamientos fueron realizados en el contexto de una reclamación de daños por defectos bajo el artículo 9 de la Ley de la Oficina del Oficial de Construcción, no existen razones de peso para rehusarnos a extender la referida normativa a reclamaciones por vicios de construcción de una vivienda al amparo del Artículo 1483 del Código Civil. Adoptar la postura contraria tendría el efecto de reducirle injustificadamente al consumidor el plazo

durante el cual tiene derecho a reclamar la garantía decenal. Ello porque la expedición del permiso de uso por ARPE es anterior al momento en que se realiza la compraventa.

Por ende, es nuestro criterio que el término para reclamar por vicios de construcción al amparo del referido artículo comienza a decursar en el momento en que se otorga la escritura de compraventa de la propiedad y no en el momento en que ARPE expide los permisos de uso de la vivienda.

Con este marco normativo en mente, pasemos a considerar los hechos que tenemos ante nos.

III.

En el presente caso, Levitt argumenta que la fecha en que los compradores adquirieron la residencia al otorgar la escritura de compraventa correspondiente es irrelevante a los fines de computar el término para reclamar por vicios de construcción al amparo del Artículo 1483. Alega que el punto de partida para el cómputo del referido término era la fecha en que los profesionales de construcción a quienes les habían encomendado edificar el complejo residencial en controversia le entregaron las viviendas a Levitt. No le asiste la razón.

El propósito de la garantía decenal es proteger al consumidor de los vicios ocultos que atentan contra la seguridad de lo que se edifica. *Véase a* <u>Rivera v. A.C.</u>

Development Corp., *supra*. A estos efectos, mediante la causa de acción conferida por el Artículo 1483 se intenta imponerle a quienes se lucran de la industria de la construcción la responsabilidad de garantizarle a los consumidores el pleno disfrute de las edificaciones que adquieren. Pacheco Torres v. Estancias de Yauco, *supra*. Por esto, a tenor con la clara política pública que subyace a los referidos preceptos, hemos adoptado interpretaciones que favorecen a la parte más débil, el consumidor, quien por lo general es lego en materia de construcción y muchas veces no tiene los recursos suficientes para hacer valer sus derechos frente a las poderosas empresas constructoras y desarrolladoras. Rivera v. A.C. Development Corp., *supra*.

En vista de los anteriores principios, nos parece excesivamente formalista y rígida la solución propuesta por Levitt a la controversia en el caso de autos. Reconocer que en el presente caso el plazo decenal se activó cuando ARPE le expidió los permisos de uso de la residencia a Levitt equivaldría a concederle a éstos un dominio absoluto para determinar cuándo comienza a transcurrir el referido plazo decenal contra los compradores. No podemos avalar una interpretación del Artículo 1483 que tiene el efecto de reducirle injustificadamente al comprador el término durante el cual puede presentar una reclamación por daños producto de vicios de construcción. Ello sería contrario a la

clara política pública en estos casos de favorecer al consumidor el cual usualmente está en una posición de desventaja frente al constructor y al desarrollador.

Por ende, concluimos que en el caso de autos el plazo decenal comenzó a decursar en el momento en que los compradores otorgaron la escritura de compraventa y no cuando ARPE expidió los permisos de uso de la residencia. Como consecuencia de esto, estimamos que la acción de los compradores en contra de Levitt al amparo del Artículo 1483 fue presentada dentro del término provisto en ley para ello.

IV.

En atención a los fundamentos antes expuestos, se confirma la Sentencia emitida por el Tribunal de Apelaciones en el caso de epígrafe y se devuelve el caso al foro de instancia para la continuación de los procesos de forma compatible con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez disiente con Opinión escrita a la cual se une la Juez Asociada señora Fiol Matta.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ángel J. Suárez Sierra
Mildred L. Santana Mejías

    Recurridos

          v.

                                    CC-2004-701

Levitt Homes, Inc. y otros

    Peticionaria

Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez a la cual se une la Jueza Asociada señora Fiol Matta.

San Juan, Puerto Rico, a 11 de abril de 2006

    La controversia planteada en este caso nos permitía expresarnos por vez primera sobre cuándo comienza a transcurrir el plazo decenal establecido en el Artículo 1483 del Código Civil para reclamar por los vicios de construcción surgidos en una residencia de un proyecto de urbanización. Soy del criterio que en desarrollos de viviendas nuevas, el plazo decenal se activa con la recepción definitiva de la obra de parte del promotor quien, en su función de promitente inmobiliario, es el comitente originario del contrato de ejecución de obra. En este caso en particular como habremos de discutir,

esa fecha quedó fijada en el momento de la expedición de los permisos de uso por la Administración de Reglamentos y Permisos.

Lamentablemente, la sentencia dictada en el día de hoy concluye que el plazo decenal "comenzó a decursar en el momento en que los compradores otorgaron la escritura de compraventa y no cuando ARPE expidió los permisos de uso." No queda claro en qué posición queda el promotor de la obra frente al contratista a la luz de esta conclusión. ¿Puede éste instar una acción por vicios ocultos si no ha vendido la unidad de vivienda? Si la respuesta es en la afirmativa, ¿cuándo comienza a correr su término? ¿Es que hay más de un plazo decenal para un proyecto de viviendas como el de autos, uno para el promotor y otro para el consumidor adquirente? Por otro lado, ¿qué ocurre si se anula el negocio jurídico de la compraventa? ¿Qué efecto tendrá una determinación de nulidad de la escritura pública otorgada? Estas interrogantes, como muchas otras, nos obligan a disentir de la decisión que hoy toma una Mayoría de este Tribunal.

El efecto real de la sentencia dictada en el día de hoy es entonces, el de multiplicar el plazo decenal aplicable a un desarrollo de viviendas como el de autos, ya que habrá un plazo distinto para cada residencia, en función de la fecha en que ésta fue adquirida por el consumidor. La ausencia de un plazo decenal uniforme computado a partir de la fecha en que el proyecto fue

aceptado por el promotor, como sostengo, expone al contratista a responsabilidad por tiempo indefinido, toda vez que al momento de la entrega del proyecto no se sabe cuándo se venderá la última residencia en ese complejo residencial. Ello, a mi juicio, crea, innecesariamente, inestabilidad e incertidumbre en este renglón de la economía.

La mayoría llegó a su conclusión extrapolando lo resuelto en *Asoc. de Residentes Pórticos de Guaynabo v. Compad, S.E.*, res. 16 de diciembre de 2004, 163 D.P.R. ___, 2004 TSPR 203, a la controversia en este caso.[1] Discrepamos de este curso de acción ya que *Asoc. de Residentes Pórticos de Guaynabo,* **nada tiene que ver con el Artículo 1483 del Código Civil, tan es así que dicho articulado ni tan siquiera se menciona en la Opinión emitida de este Tribunal en ese caso.**

Veamos entonces con mayor detenimiento.

### I.

El 30 de diciembre de 2002 el señor Ángel Juan Suárez Sierra, su esposa Mildred L. Santana Mejías y la Sociedad Legal de Gananciales compuesta por ambos (demandantes o

---

[1] *Asoc. de Residentes Pórticos de Guaynabo v. Compad, S.E.*, res. 16 de diciembre de 2004, 163 D.P.R. ___, 2004 TSPR 203, es un caso instado por la junta de directores de un complejo residencial sometido al régimen de propiedad horizontal para reclamar por unos defectos o vicios aparentes en los elementos comunes del inmueble. La reclamación por estos daños se instó ante el Departamento de Asuntos del Consumidor, a tenor con lo dispuesto en la Ley de la Oficina del Oficial de la Construcción.

recurridos) presentaron demanda sobre vicios de construcción en su residencia y daños y perjuicios contra Levitt Homes, Inc. (demandado o peticionario) y otros demandados de nombre desconocido. En la demanda alegaron que el 31 de diciembre del año 1992 otorgaron escritura de compraventa de su residencia identificada como CE-41 de la Urbanización Camino del Mar en Toa Baja. Dicha urbanización fue desarrollada por el demandado Levitt Homes; y Levitt Mortgage fue la institución que financió la compra de la residencia de los demandantes. A ese momento Levitt no había terminado de corregir ciertos defectos de construcción que habían sido señalados por los compradores luego de una inspección ocular de la residencia. No obstante, sostienen los demandantes que Levitt tenía urgencia de cerrar la compraventa antes de finalizar el año 1992, por cuanto accedieron a otorgar las escrituras con el compromiso de Levitt de corregir dichos defectos en enero 1993. Así sucedió y el 15 de enero de 1993 el señor Suárez firmó un documento certificando que, con excepción de un gabinete de cocina que faltaba por instalar, los demás defectos habían sido debidamente corregidos por Levitt Homes. Véase Apéndice del *Certiorari* a la pág. 221.

Años después, el 15 de diciembre de 1998, los compradores suscribieron una carta a Levitt Homes comunicando por primera vez sobre vicios de construcción que habían surgido en la residencia. Levitt Homes no actuó en relación a esta comunicación.

Así las cosas, el 30 de diciembre de 2002 el matrimonio Suárez-Santana demandó, amparado en el Artículo 1483 del Código Civil, 31 L.P.R.A. sec. 4124. Reclamaron la corrección de los alegados vicios de construcción o el reembolso de los costos para corregir los mismos, según fuera el caso; más cuarenta mil dólares ($40,000) en concepto de daños y perjuicios, costas y gastos.[2]

Luego de contestar la demanda, Levitt Homes presentó, el 17 de abril de 2003, solicitud de sentencia sumaria para desestimar la demanda en su contra. Adujo que los defectos alegados no fueron reclamados dentro del término establecido en el Reglamento Núm. 2268 del Departamento de Asuntos del Consumidor (D.A.Co.), Reglamento para Regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de Viviendas en Puerto Rico. En la alternativa, alegó que la reclamación al amparo del Artículo 1483 del Código Civil, estaba prescrita toda vez que la demanda fue presentada en exceso de los diez (10) años que dispone dicho artículo. Levitt sostuvo que dicho plazo decenal comenzó a transcurrir el 17 de diciembre de 1992, fecha que denota cuándo concluyó la construcción de la residencia. Fue en esta fecha que la Administración

---

[2] En esencia, los vicios de construcción reclamados consisten en grietas en las paredes de varias áreas de la residencia, lo que ha causado filtraciones y hongos en las paredes; gabinetes de cocina de mala calidad que se cayeron; y bañeras que se rompieron debido a la mala instalación. Además, alegaron que sus dos hijos menores de edad han desarrollado padecimientos respiratorios a raíz de los hongos de humedad causados por las grietas. Véase Demanda en el Apéndice del *Certiorari,* a la pág. 178.

de Reglamentos y Permisos (ARPE) expidió a Levitt el permiso de uso de la unidad en controversia.

Con el beneficio de los argumentos de las partes en relación a la moción de sentencia sumaria, el Tribunal de Primera Instancia dictó el 12 de diciembre de 2003 Resolución denegando la misma. El tribunal concluyó que una controversia sobre la existencia de vicios de construcción no puede disponerse mediante el mecanismo de sentencia sumaria; y en todo caso, que el plazo decenal se activó el 31 de diciembre de 1992 con el otorgamiento de la escritura pública de compraventa, momento que representa la aceptación definitiva de la obra.

No conforme, Levitt acudió al Tribunal de Apelaciones en recurso de *certiorari.* Evaluadas las posiciones de las partes, el foro intermedio denegó expedir el recurso, reiterando en su resolución que el punto de partida del plazo decenal es la fecha de otorgamiento de la escritura de compraventa. Inconforme aun, Levitt acudió ante este Tribunal alegando como único error que:

> Erró el Tribunal de Apelaciones al denegar el auto solicitado por concluir que el periodo de diez (10) años que provee el Art. 1483 del Código Civil de Puerto Rico comenzó a decursar al momento en que la parte demandante otorgó la escritura de compraventa de la propiedad en controversia.

Examinada la solicitud de *certiorari,* expedimos el recurso. Las partes han comparecido, así como también la Asociación de Constructores de Hogares de Puerto Rico quien compareció como *amicus curiae.*

**II**

El   Código  Civil,  en  su  artículo  1483,  31  L.P.R.A.
sec.  4124,  regula  las  consecuencias  jurídicas  de  la  ruina
de  un  edificio  cuando  ésta  es  atribuible  al  profesional  de
la  construcción  que  dirigió  la  obra,  frente  a  aquel  que
encárgó  la  misma.   Dicho  artículo  dispone  que:

> El contratista de un edificio que se arruinase por vicios de la
> construcción, responde de los daños y perjuicios si la ruina
> tuviere lugar dentro de diez (10) años, contados desde que
> concluyó la construcción; igual responsabilidad, y por el mismo
> tiempo, tendrá el arquitecto que la dirigiere, si se debe la
> ruina a vicios del suelo o de la dirección.
>
> Si la causa fuere la falta del contratista a las condiciones
> del contrato, la acción de indemnización durará quince (15)
> años.

El  referido  artículo,  a  manera  de  excepción,  prolonga
la  responsabilidad  de  los  contratistas  y  arquitectos  en
relación  a  la  obra  ejecutada,  más  allá  de  la  entrega  de  la
cosa.   G.  Velázquez,  *Responsabilidad  por  los  defectos  en
las  edificaciones*,  20  Rev.  Jur.  U.P.R.  13,  (1950).   Este
precepto  se  fundamenta  en  el  hecho  que,  como  norma  general,
la  entrega  de  la  cosa  y  el  examen  que  se  haga  de  ella  no
son  suficientes  para  conocer  todos  los  vicios  de  los  que  la
cosa  pueda  adolecer.   Probablemente,  por  la  naturaleza
misma  de  los  edificios,  esos  defectos  no  se  han
exteriorizado  a  ese  momento,  sino  que  sólo  podrán  ser
observados  con  el  transcurso  de  cierto  tiempo.   En  atención
a  esto,  la  ley  fija  un  periodo  de  tiempo  en  el  cual  la
responsabilidad  del  contratista  o  arquitecto  pueda
reclamarse.   J.M.  Manresa  y  Navarro,  *Comentarios  al  Código*

*Civil Español,* Tomo X, Vol. 2, Editorial Reus, Madrid, 1969, a la pág. 709.

La responsabilidad que emana de este artículo se denomina comúnmente "responsabilidad decenal", en atención al plazo dispuesto en su primer párrafo. Esta responsabilidad por ruina se origina en consideraciones de interés público, pues por motivos de seguridad pública se hace necesario garantizar la buena construcción y estabilidad de lo edificado para no someter al público a riesgos indebidos. F. Arnau Moya, *Los vicios de la construcción,* Tirant Lo Blanch, Valencia, 2004, págs. 23-24. Incluso, se entiende que la protección del interés general y público se impone a la protección del interés privado en el cumplimiento de la prestación debida. J. Puig Brutau, *Fundamentos de derecho civil,* Tomo II, Vol. II, Bosch, Barcelona, 1987, pág. 452. A estos efectos nos expresamos en *González v. Agostini,* 79 D.P.R. 510 (1956), donde resolvimos que la renuncia al plazo decenal es nula por ser contraria al orden público. Véase también *Géigel v. Mariani,* 85 D.P.R. 46 (1962); *Luan Investment Corp. v. Rexach Construction Co.,* 152 D.P.R. 652 (2000).

Conforme ha venido exigiendo la doctrina al interpretar el Artículo 1483, para que tenga lugar la responsabilidad decenal deben cumplirse ciertos requisitos, a saber: que las personas responsables hayan participado

en la construcción de un edificio[3]; que dicho edificio sufra de ruina[4]; que la ruina se manifieste dentro del término de diez (10) años desde que concluyó la construcción del edificio[5]; que la ruina se deba a vicios de construcción[6] o del suelo, o a la falta del contratista a las condiciones contractuales. F. Arnau Moya, *supra,* págs. 35-36.

Mediante nuestra jurisprudencia hemos interpretado los mencionados requisitos, delineando así la doctrina vigente en materia de responsabilidad decenal por ruina. La controversia que hoy nos ocupa nos ofrece la oportunidad de expresarnos sobre el requisito temporal del Artículo 1483. Ya anteriormente, con el propósito de lograr uniformidad en este tipo de reclamación, habíamos adoptado la doctrina del plazo único. Esta doctrina postula que para que proceda la acción decenal, los vicios deben surgir dentro del término

---

[3] El término edificio comprende toda estructura que se erija sobre el suelo con el propósito que quede adherida a éste. *Federal Insurance v. Dresser,* 111 D.P.R. 96 (1981).

[4] Se ha reconocido que la responsabilidad decenal cubre distintas etapas de ruina; sea ésta ruina total, ruina parcial, amenaza de ruina o hasta la ruina funcional que no requiere que se comprometa la solidez del edificio. Véase *Maldonado Pérez v. Las Vegas Development,* 111 D.P.R. 573, 575 (1981); *Rivera Rentas v. A&C Development,* 144 D.P.R. 450 (1997).

[5] Término que hemos caracterizado como de garantía y caducidad. *Zayas v. Levitt & Sons,* 132 D.P.R. 101 (1992).

[6] Hemos definido el "vicio de construcción" como el defecto que excede la medida de las imperfecciones que cabe esperar en una construcción. *Géigel v. Mariani, supra; Maldonado Pérez v. Las Vegas Development, supra.* Más aun, hemos establecido que el Artículo 1483 sólo opera para los vicios de construcción que sean ocultos, aquellos que no hayan podido ser detectados al momento de la compraventa. *González v. Agostini, supra; Constructora Bauzá v. García López,* 129 D.P.R. 579 (1991); *Pacheco Torres v. Estancias de Yauco,* res. el 30 de septiembre de 2003, 2003 T.S.P.R. 148, 160 D.P.R. ___.

de diez (10) años, y dentro de ese mismo término debe ejercitarse la correspondiente acción legal. En *Rivera Rodríguez v. Las Vegas Development,* 107 D.P.R. 384 (1978), reconocimos que la doctrina del plazo único ha sido criticada por su rigurosidad, ya que tiene el efecto práctico de acortar el plazo de garantía. No obstante, defendimos la doctrina por entender que el acortamiento del plazo --sobre el cual nos expresamos como un término "ya largo de por sí"-- es precisamente la tendencia de los códigos modernos. Además, consideramos que equiparar el término de garantía con el plazo de caducidad adelantaba el deseo de determinar el momento exacto en que expira la responsabilidad, ofreciendo así mayor certeza en cuanto a la posibilidad de la reclamación. Véase también *Zayas v. Levitt & Sons,* 132 D.P.R. 101 (1992).

Debemos ahora determinar en qué momento específico se activa ese plazo decenal. El propio Artículo 1483 --que corresponde al Artículo 1.591 del Código Civil Español-- literalmente dispone que este plazo transcurre "desde que concluyó la construcción". No empece la aparente claridad de este precepto, la doctrina española se encuentra dividida en su interpretación. La divergencia de opiniones se basa en la interrogante sobre si la conclusión de la construcción se refiere al sentido material o hecho físico (terminación material de las obras); a la entrega o puesta a disposición de la obra; o finalmente, al hecho jurídico de la recepción. M.A. Del Arco y M. Pons, *Derecho de la*

*Construcción,* Editorial Hesperia, Madrid, 1988, pág. 302. En esta última teoría, se entiende que el término "construcción" comprende el contenido de la prestación al que viene obligado el contratista, que por su parte incluye la entrega y recepción de la obra una vez terminada. J. Cadarso Palau, *La responsabilidad decenal de arquitectos y constructores,* Editorial Montecorvo, Madrid, 1976, pág. 346.

Algunos autores, entre ellos Manresa y De la Cámara, fijan el día de la entrega de la obra como aquel que da inicio al plazo decenal, considerando esta responsabilidad como una excepción a la norma general que libera de responsabilidad al contratista con la entrega. J. M. Manresa y Navarro, *supra,* pág. 709. Contribuye a la polémica sobre el punto de partida de la responsabilidad decenal el hecho que el propio Código Civil no distingue entre la entrega y recepción de la cosa, ni regula esta etapa adecuadamente, gestión que le ha correspondido a los tribunales. Véase F. Arnau Moya, *supra,* pág. 58; Rubio San Román*, La responsabilidad civil en la construcción,* Colex, Madrid, 1987, a la pág. 134. En su sentencia del 14 de octubre de 1968 el Tribunal Supremo de España acogió la doctrina generalizada que distingue entre la entrega y la recepción de la cosa, y enfatizó que la recepción puede operar con anterioridad o con posterioridad a la entrega de la cosa. No obstante, como advierten Diez Picazo y Guillón, lo que la sentencia llama recepción es lo que

técnicamente se denomina aprobación, que por lo general conlleva una entrega previa de la cosa. L. Diez Picazo y A. Guillón, *Sistema de derecho civil,* Volumen II, Tecnos, Madrid, 1985. Así también, la sentencia del 19 de julio de 1977 distingue entre entrega y recepción al definir la primera como una "mera actividad física" y la segunda como la "manifestación de voluntad expresa o tácita, por la que se expresa la conformidad con la obra efectuada, **y que es relevante por el cómputo de plazo y saneamiento**".[7] (Énfasis nuestro.)

Un sector minoritario de la doctrina adelanta la tesis que el momento decisivo es el momento del hecho físico de la terminación de la obra. Esta posición ha sido avalada, entre otros, por García Cantero[8]; García Conesa[9]; y

---

[7] Un análisis de la jurisprudencia del Tribunal Supremo de España demuestra que la tendencia es hacia reproducir el sentido literal del Artículo 1.591, "desde que se concluyó la obra", sin entrar a precisar si se trata de la recepción. Véanse las sentencias del 11 de noviembre de 1984, 17 de febrero de 1987, 21 de marzo de 1996, 16 de abril de 2001. Excepción a esto lo constituye la sentencia del 19 de julio de 1977.

[8] Opina García Cantero que la redacción del Artículo 1.591, que señala el punto de partida del plazo decenal en la conclusión de la construcción, se aparta intencionalmente de la doctrina prevaleciente en Francia, que apoya la teoría de la recepción de la obra. El correspondiente artículo del Código Francés guarda silencio sobre el punto de partida. Según citado en J. Herrera Catena, *Responsabilidades en la construcción,* Volumen I, Granada, 1983, pág. 26.

[9] Para García Conesa el plazo decenal "[s]e inicia con el hecho físico de la finalización de la obra notificado por el contratista al comitente, que suele coincidir o distanciarse sólo breves fechas de la entrega y recepción definitiva, pero no desde ésta última." A. García Conesa, *Derecho de la Construcción,* Bosch, Barcelona, 1996, pág. 471.

Fernández Hierro[10]. Así también, Gómez de la Escalera menciona que no debe depender el punto de partida del plazo decenal en un acto contractual como lo es la recepción, en la medida que, según su opinión, no se trata de una responsabilidad contractual. Además, opina que el acto jurídico de la recepción se presta a que ésta se efectúe sin que la obra esté concluida; y destaca que es más fácil probar un hecho físico tal como la conclusión, a un hecho jurídico como lo es la recepción. C. R. Gómez de la Escalera, *La responsabilidad civil de los promotores, constructores, y técnicos por los defectos de construcción,* Bosch, Barcelona, 1994, págs. 183-185.

De otro lado, la posición dominante en la doctrina adelanta que el plazo decenal se activa con el hecho jurídico de la recepción definitiva de la obra[11]. Esta tesis postula que únicamente mediante la declaración de voluntad del dueño --sea ésta expresa o tácita-- de aceptar la entrega de la obra, es que puede considerarse que ésta ha sido concluida.

Una vez finalizada la obra, la doctrina distingue entre tres etapas de posible manifestación. Primero, la verificación de la obra, consiste en el examen realizado con el objetivo de obtener los elementos necesarios para

---

[10] Opina Fernández Hierro que el sentido literal del artículo 1.591 "no parece posible aventurar otra hipótesis al respecto." Según citado en C. R. Gómez de la Escalera, *supra,* pág. 182.

[11] Esta posición mayoritaria fue acogida en España mediante legislación, por la Ley de Ordenación de la Edificación (LOE), vigente desde el 6 de mayo de 2000, según discutiremos más adelante. F. Arnau Moya, *supra,* a la pág. 61, n.133.

poder pasar juicio sobre la construcción. Segundo, la aprobación, es la declaración emitida favorablemente a consecuencia de la verificación, que implica la obligación de aceptar la obra. Finalmente, la recepción --resultado de las dos fases anteriores--, surge a consecuencia de la entrega o puesta a disposición que hace el contratista de la cosa, y de la obligación que surge para el comitente en recibir la obra por haberla aprobado. Véase L. Diez Picazo y A. Guillón, *supra*, pág. 466; J. I. Rubio San Román, *supra*, págs. 134-135; M. A. Del Arco y M. Pons, *supra,* a la pág. 291. En otras palabras, se entiende como recepción el acto jurídico mediante el cual se acepta la obra por parte del dueño o comitente; con el efecto jurídico de tener por cumplidas las obligaciones del contratista. M. A. Del Arco y M. Pons, *supra,* pág. 289; I.E. Molina, *Responsabilidad de los profesionales de la construcción por ruina,* Buenos Aires, 1989, pág. 80.[12]

La doctrina también se ha encargado de fragmentar la recepción en dos etapas: la provisional y la definitiva. La recepción provisional, cuyo cometido es la comprobación de la obra, no cubre ninguna clase de defectos de obra, salvo pacto en contrario. Más bien, el dueño se reserva el derecho de examinar la obra y hacer reclamos por vicios para que éstos sean corregidos. Diez Picazo y Guillón, *supra,* pág. 467. De otro lado, la recepción definitiva es aquella mediante la

---

[12] La profesora Inés Elena Molina definió de esta manera la recepción al interpretar el Artículo 1646 del Código Civil de Argentina, correspondiente a nuestro Artículo 1483.

cual el comitente acepta que la obra ha sido ejecutada correctamente y se ajusta a lo convenido. J. Puig Brutau, *supra,* pág. 149. De acuerdo a la doctrina, y así resolvimos en *Pacheco Torres v. Estancias de Yauco,* res. el 30 de septiembre de 2003, 2003 T.S.P.R. 148, 160 D.P.R. ___; con la recepción definitiva el dueño renuncia a reclamar por los vicios aparentes, no así por los vicios ocultos ni aquellos que causen la ruina del inmueble, que aun siendo aparentes, constituyen incumplimiento del contrato de construcción.

En cuanto a cómo opera la recepción, el Código Civil no exige formalidad alguna para efectuarla. Por consiguiente, se entiende que rigen las normas generales sobre la declaración de voluntad. Según adelantamos, la doctrina generalizada admite que la recepción se puede llevar a efecto tanto en modalidad expresa como tácita. Del Arco y Pons resaltan que en la práctica es frecuente que la recepción se lleve a cabo expresamente, mediante un acta de recepción levantada a esos efectos con la comparecencia de las partes contratantes. No empece, se reconoce la recepción tácita resultante de hechos y acciones que representen la intención del dueño de aceptar la obra. A manera de ejemplo, se deduce la recepción tácita del pago del precio sin reserva alguna y de la utilización de la obra luego de haber tomado sin reparos posesión de ésta. Lo esencial es que de los actos del dueño surja necesariamente la voluntad de aceptar la obra sin restricciones. Del Arco y Pons, *supra,* pág. 297; Diez Picazo y Guillón, *supra,* pág. 467.

Es con la recepción definitiva, según la doctrina mayoritaria, que se determina el punto de partida del plazo decenal. Entre otros tratadistas españoles, comparten esta opinión Herrera Catena, Cadarso Palau, Del Arco y Pons, Fernández Costales y Cabanillas Sánchez. F. Arnau Moya, *supra,* pág. 58, n.121. Herrera Catena resalta que la recepción cumple la mínima finalidad de ayudarnos a determinar el momento de la conclusión de la obra. Este autor advierte que "si dejamos reducido el concepto 'conclusión' a lo puramente *físico*, la imprecisión del mismo podría conducirnos a incertidumbres e inconcreciones, respecto a un dato fundamental imprescindible; el punto de partida del plazo decenal de garantía." J. Herrera Catena, *supra,* pág. 27.

Así también Del Arco y Pons opinan que la entrega de la obra por el contratista, con la correspondiente toma de posesión del dueño, no equivale a la recepción de ésta, a menos que no se hayan producido otros hechos de los que claramente resulte la intención del último de aceptar la obra. Consideran estos autores que debe optarse por la recepción definitiva como el momento en el que comienza a contar el plazo decenal; ya que esta ofrece la ventaja de precisar la fecha, asunto importante para consignar el inicio de dicho término. Del Arco y Pons, *supra,* pág. 302.

Por su parte, Cadarso Palau al defender la tesis de la recepción definitiva, destaca que utilizar la fecha de la terminación física de la obra plantea una serie de

complicaciones de prueba, como por ejemplo el determinar cuándo queda definitivamente terminada la obra y cómo consignar este hecho, cuestiones que quedan resueltas si se utiliza la recepción como punto de inicio del plazo de responsabilidad decenal. J. Cadarso Palau, *supra,* pág. 349.

Evaluadas las diversas posturas doctrinales, la posición de la doctrina mayoritaria que fija el inicio del plazo decenal en la recepción definitiva de la obra, refleja a mi juicio lo que debe ser la norma a adoptar. Coincidimos en que no puede entenderse concluida la construcción de la obra sin que su dueño haya aceptado la misma mediante el proceso de verificación, aprobación y recepción; proceso que culmina con la recepción definitiva. Con el hecho jurídico de la recepción definitiva es que el comitente manifiesta su voluntad de aceptar la obra y es en ese momento que se entiende cumplida la obligación del contratista, quedando en ese momento sujeto a responder por la responsabilidad decenal del Artículo 1483. Consideramos esta norma compatible con nuestro desarrollo jurisprudencial de la responsabilidad por ruina, que ha fomentado la importancia de alcanzar uniformidad y certeza en este tipo de reclamación.

Ahora bien, el anterior principio no dispone finalmente de la controversia que nos ocupa. Para resolver la misma debemos determinar si la recepción definitiva en un proyecto de viviendas nuevas se configura de parte del

desarrollador o de parte del consumidor adquirente. Veamos.

**III**

Según indicamos, el peticionario Levitt Homes sostiene que el plazo decenal comienza a transcurrir con la concesión del permiso de uso por parte de ARPE. Propone esta gestión como la mejor evidencia que la construcción ha terminado y la residencia está lista para ser habitada. Resalta que dada la naturaleza de la industria de la construcción en Puerto Rico, utilizar como punto de origen de responsabilidad decenal la fecha del otorgamiento de la escritura de compraventa **tendría el efecto de crear un sinnúmero de distintos plazos decenales para un solo proyecto**. Arguye, además, que el plazo no debería extenderse a conveniencia del comprador pues esto representaría una onerosa imposición de responsabilidad al contratista.

De otro lado, los recurridos apoyan la teoría que la recepción definitiva de la obra opera al momento que el consumidor adquiere la residencia, lo que concuerda con la política pública de favorecer a la parte más débil en la negociación. Alegan que el consumidor adquirente desconoce el momento en que ARPE expide sus permisos, por cuanto el basar el punto de partida en esta fecha sería no reconocerle enteramente al comprador su derecho a reclamar por la garantía decenal.

Para resolver esta controversia, es menester analizar la naturaleza del contrato de obra en atención a los sujetos involucrados en el mismo, conforme a la realidad social de nuestros tiempos. Ya anteriormente habíamos definido el contrato de arrendamiento de obra --mejor denominado como contrato de ejecución de obra-- "como esencialmente uno de trabajo, mediante el cual una de las partes se encarga de hacer una cosa para la otra, mediante un precio convenido entre ellos." *Master Concrete Corporation v. Fraya,* 152 D.P.R. 616, 623 (2000). Es un contrato consensual, bilateral y oneroso cuyos elementos principales son la obra a realizarse y el precio acordado. Mediante este contrato, el dueño o propietario de la obra --también conocido como comitente-- tiene la obligación de pagar el precio en la forma convenida; mientras que el contratista se obliga a realizar y entregar la obra conforme a lo pactado. *Íbid.*

Se ha mencionado que el esquema triangular del Artículo 1483 de enumeración de sujetos en relación al contrato de obra --comitente, contratista y arquitecto-- no debe verse como una lista exhaustiva, sino más bien como producto de la época en la que se redactó el Código Civil. En esa época de finales de Siglo XIX, bastaba para construir una edificación un comitente que contratara, para su propio uso, la construcción de una edificación con un contratista o arquitecto. Véase Gómez de la Escalera, *supra,* pág. 208; F. Arnau Moya, *supra,* págs. 122-124. La

doctrina y jurisprudencia modernas, han empezado a considerar obsoletos los términos utilizados y la forma de entenderlos, atemperando así los conceptos del contrato de obra a la realidad actual. Hoy día la situación es muy diferente ya que es común que se construya para vender; y además han evolucionado considerablemente las técnicas de la construcción. Como resultado, han aparecido nuevos sujetos no previstos por el legislador decimonónico. Según comenta Arnau Moya en relación al moderno contrato de obra:

> [D]icha operación está integrada al menos por cuatro personas: el arquitecto y demás técnicos, el constructor, el promotor, (o único promotor-constructor) y el subadquirente de viviendas. El grupo de contratos puede ampliarse si en la obra concurren subcontratistas o si el edificio dentro del período de garantía ha sido objeto de más transmisiones.

F. Arnau Moya, *supra,* pág. 123.

Sin lugar a dudas, resaltan el promotor y el subadquirente como nuevos sujetos en la cadena de construcción. En la actualidad, se conoce al promotor como "aquel comitente que promueve un proyecto de nueva planta, cuya ejecución encomienda a un tercero, para una vez terminado, pretenderlo introducir en el mercado de venta o alquiler." A. García Conesa, *Derecho de la Construcción,* Bosch, Barcelona, 1996, pág. 63. Este tribunal ya ha reconocido la figura del promotor inmobiliario, destacando que son tres sus rasgos distintivos, a saber: es un profesional de la construcción; es quien concibe y organiza la construcción de la obra, determina lo que desea hacer, adquiere el terreno, contrata los profesionales que han de

encargarse de la ejecución de la obra, y gestiona el financiamiento; y, finalmente, es quien organiza la construcción para que otros la adquieran, arrienden o gocen de algún otro derecho real sobre ésta. *Acevedo Hernández v. Viñas Sorba,* 111 D.P.R. 633 (1981). Así, en *Acevedo Hernández v. CRUV,* 110 D.P.R. 655 (1981) adoptamos la figura y, conforme a la doctrina, le reconocimos al promotor inmobiliario legitimación pasiva en términos de la responsabilidad decenal, asimilándolo al constructor y equiparando su responsabilidad a la del contratista o arquitecto.

También la doctrina y jurisprudencia española reconocen legitimación activa al promotor, **por ser éste el comitente real o formal de la obra, que la lleva a término como sujeto originario del contrato de obra.** García Conesa, *supra,* pág. 63.[13] En la sentencia del 14 de abril de 1983 (Aranzadi 2112) el Tribunal Supremo de España reconoció la legitimación activa del promotor inmobiliario. Se destacó que el considerar al promotor como sujeto legitimado pasivamente en una acción de responsabilidad decenal no impide que además se le reconozca a éste legitimación activa para reclamarle al constructor, pues

---

[13] Adviértase que mientras todo promotor es comitente dentro del contexto de un contrato de obra inmobiliaria; no todo comitente es promotor, pudiéndose dar el caso que contrate propiamente el destinatario final de la construcción. García Conesa, *supra,* pág. 67.

está fundamentalmente legitimado para llevar estas reclamaciones como dueño original de la obra.[14]

En cuanto a los terceros consumidores que adquieren del promotor el inmueble --conocidos también como adquirentes o subadquirentes-- la doctrina admite sin mucha dificultad su legitimación activa para exigir responsabilidad por la ruina. Se han desarrollado varias teorías al respecto; siendo el fundamento más seguido por el Tribunal Supremo de España la teoría de la subrogación. Según ésta, el adquirente se subroga en los derechos del promotor, profesional de la construcción, para reclamar por la responsabilidad decenal.[15] Véase F. Arnau Moya, *supra*, págs. 130-133; C. R. Gómez de la Escalera, *supra,* págs. 201-208.

Habida cuenta que la tendencia doctrinal mayoritaria es la de considerar al promotor como el comitente formal y dueño originario de la obra, y al tercero adquirente como aquél que se subroga en sus derechos; **lógico es concluir que el término de responsabilidad decenal se activa con la recepción definitiva de la obra por parte del promotor.** De

---

[14] Incluso, la jurisprudencia española ha reconocido legitimación activa al promotor para reclamar por la ruina luego de éste haber enajenado el inmueble. Véase la sentencia del 9 de junio de 1989 (Aranzadi 4417).

[15] También se defienden la teoría de la obligación *propter rem,* que considera la acción como una protectora de la propiedad que se transmite con ésta; teoría de la accesoriedad, que atiende la responsabilidad decenal como un derecho accesorio al derecho de propiedad del edificio; y la teoría del interés, que postula que junto con la propiedad se transmite también el interés protegido por la responsabilidad decenal. Para una discusión más detallada véase F. Arnau Moya, *supra*, págs. 130-133; C. R. Gómez de la Escalera, *supra,* págs. 201-208.

fijarse el punto de partida de dicho plazo en la recepción definitiva por parte del consumidor adquirente de la propiedad, estaríamos negando al promotor la legitimación activa para reclamar por la ruina; protección jurídica que deriva de su condición de comitente. ¿O, peor aun, es que existen dos términos decenales; uno para el promotor y otro para los adquirientes? Por consiguiente, descartamos la fecha del otorgamiento de la escritura de compraventa como punto de origen del plazo decenal.

Precisamente, ésta ha sido la interpretación que le ha dado al asunto la legislación española. El 5 de noviembre de 1999 se promulgó en España la Ley 38 sobre la Ordenación de la Edificación (LOE), con los múltiples propósitos de: salvaguardar la debida protección al adquirente de la edificación; fomentar la calidad de la edificación disponiendo unos requisitos mínimos de seguridad y funcionalidad; delimitar las funciones que deben ser asumidas por las partes involucradas en la construcción; y establecer las garantías necesarias para que los vicios de construcción sean propiamente atendidos. Al igual que el Artículo 1483 del Código Civil, la ley establece un término de responsabilidad decenal. F. Arnau Moya, *supra,* págs. 173-174. Véase también, P. Fermería López, *Responsabilidad extracontractual por ruina de edificios (De acuerdo con Ley 38/99, de 5 de noviembre sobre Ordenación de la Edificación),* Tirant lo Blanch, Valencia, 2000.

En su Artículo 6, LOE regula directamente el régimen jurídico de la recepción. La ley define la recepción de la obra como: "[e]l acto por el cual el constructor, una vez concluida ésta, **hace entrega de la misma al promotor y es aceptada por éste.**" (Énfasis nuestro.) *Íbid*, pág. 200. Además, la ley dispone para que obligatoriamente se consigne la recepción de la obra mediante un acta que deberá estar firmada al menos por el promotor y por el constructor. La ley es clara en destacar la importancia de la recepción como el momento de inicio de los plazos de garantía de la propia ley, así como los plazos de caducidad por vicios ocultos y de responsabilidad contractual. *Íbid*, pág. 201. Encomiamos el esquema introducido por LOE ya que establece una fecha cierta para el comienzo del plazo decenal, otorgando una mayor uniformidad y certeza sobre la fecha en que comienza y termina la responsabilidad decenal por ruina.

En nuestra jurisdicción no existe una legislación similar a la LOE. Sin embargo, de ordinario en la industria de la construcción, cuando se trata de desarrollos de urbanizaciones de viviendas nuevas, las partes --contratista y promotor inmobiliario-- pactan expresamente, conforme a la libertad de contratación, cuándo ha de entenderse completada y aceptada la obra. A esos efectos, el desarrollador designa un inspector de obra sea este ingeniero o arquitecto, que inspecciona la obra en sus diferentes etapas y certifica cuándo se considera el

trabajo completado y listo para ser aceptado por el desarrollador.[16]   Hay que destacar que según exige la sección 6.01 del "Reglamento para la Certificación de Obras y Permisos", promulgado por la Administración de Reglamentos y Permisos, conocido como el Reglamento de Planificación Número 12, todo proyecto de construcción "a realizarse a base de un plano certificado . . ., estará bajo la supervisión de un inspector designado por el dueño de la obra".

De ordinario, las partes pactan que la recepción definitiva de la obra se hace efectiva una vez el inspector hace la correspondiente certificación de que la obra está completada.  Véase J. Sweet, *Sweet on Construction Industry Contracts: Major IAI Documents,* Wiley Law Publications, Aspen, 1987, secs. 5.12, 5.13, 5.18, 15.3, 16.13, 16.17.  En otras palabras, es en el momento en el que las partes lo hayan pactado que se da la recepción definitiva de la obra. Un pacto expreso al respecto surgirá del propio contrato de obra o de algún otro documento otorgado entre las partes.  De tratarse de un pacto implícito, será entonces gestión a ser determinada por los tribunales.

Recapitulando, conforme la tendencia moderna en materia de responsabilidad decenal, soy del criterio que el plazo decenal para reclamar la ruina de un edificio en un proyecto de viviendas nuevas comienza a transcurrir con la

---

[16] Dicho Reglamento en su sección 16(a) define al inspector de obra de la siguiente manera: "Ingeniero o contratista licenciado y colegiado a quien el dueño de una obra le ha encomendado la inspección de la obra."

recepción definitiva de la obra de parte del promotor inmobiliario del proyecto de obra, según ésta haya sido pactada por las partes contratantes. Se trata de un hecho jurídico que puede surgir expresa o tácitamente. Se configura la recepción definitiva expresa cuando el promotor consigna mediante acta, certificación, u otro acuerdo expreso al que haya llegado con el contratista, en el cual aprueba la obra construida y así la acepta. Como mencionamos, también puede configurarse una recepción definitiva tácita siempre que quede clara la intención del promotor de aceptar la obra contratada.

De acuerdo a la discusión anterior, no estimamos procedente fijar automáticamente el momento de la recepción definitiva de la obra de parte del promotor con la fecha de expedición del permiso de uso de ARPE. El Artículo 5 de la Ley de Planificación y Fomento Público, Ley Núm. 135 de 15 de junio de 1967, según enmendada, 23 L.P.R.A. sec. 42 *et. seq.*, dispone que terminada la obra, el contratista que la dirige deberá presentar a ARPE una certificación juramentada que acredite que la obra se ejecutó de acuerdo a los planos y especificaciones sobre los cuales se otorgó el permiso de construcción. Esta gestión no necesariamente representa el momento de la recepción definitiva de parte del promotor inmobiliario. **Todo dependerá de lo que las partes hayan contratado, y en ausencia de pacto explícito, de que se den en la gestión de la solicitud y expedición de los permisos de ARPE, actos indicativos de la intención del**

**promotor de aceptar la obra. Solo así será viable utilizar la fecha del permiso de uso como punto de partida del plazo decenal.**

## IV

Conforme el anterior trasfondo doctrinal, evaluemos los hechos del presente caso.

En atención a las partes de la controversia, no albergamos duda que Levitt Homes fue el promotor inmobiliario del proyecto de viviendas nuevas donde ubica la residencia de los recurridos; conforme la figura ha sido trazada por nuestra doctrina. Levitt Homes es una persona jurídica, profesional de la construcción. Fue la empresa que concibió y organizó el desarrollo de la urbanización Camino del Mar, adquirió el terreno, y contrato los profesionales que tuvieron a su cargo la ejecución de las obras de construcción. Finalmente, organizó un esquema para vender las unidades residenciales a terceros consumidores, entre ellos el matrimonio Suárez-Santana. Como comitente formal y sujeto originario del contrato de obra, Levitt Homes es el primero legitimado para reclamar por responsabilidad decenal en la construcción. Por su parte los recurridos, al adquirir la residencia, se subrogaron en los derechos de Levitt.

Por consiguiente, según la norma expresada, el plazo decenal del Artículo 1483 comenzó a transcurrir al momento de la recepción definitiva de la residencia en cuestión de parte de Levitt Homes. Analizado detalladamente el

expediente que nos ocupa, consideramos que, en este caso, la expedición del permiso de uso a Levitt Homes por parte de ARPE, tácitamente representó el momento de recepción definitiva de la residencia de parte de su promotor inmobiliario. Ello así, ya que fue el propio Levitt quien gestionó el permiso de uso, lo que a nuestro juicio es indicativo de su intención de aceptar la obra como completada de acuerdo a lo pactado. Por consiguiente, resolveríamos en este caso que el plazo decenal comenzó a transcurrir el 17 de diciembre de 1992, y el mismo ya había caducado al 30 de diciembre de 2002 fecha en la que se interpuso la demanda por los alegados vicios de construcción.

**V**

Por los fundamentos expuestos revocaríamos la resolución del Tribunal de Apelaciones, y desestimaríamos la demanda contra Levitt Homes por haber sido presentada la reclamación fuera del término decenal del Artículo 1483.

Anabelle Rodríguez Rodríguez
Juez Asociada